WILCOX, Appellant, v. WILCOX and another, Respondents.

*November 27, 1964—March 5, 1965.*

618

For the appellant there was a brief and oral argument by *John T. Howard* of Sun Prairie.

For the respondents there was a brief by *Aberg, Bell, Blake &. Metzner* of Madison, and oral argument by *Carroll Metzner*.

HEFFERNAN, J. The facts present a question susceptible to a quick, easy, and long-accepted answer: That the law of the place of the tort or injury determines the law to be applied to the case. After long and earnest consideration of the problem, we reject that answer and conclude that the law to be applied in this case on the demurrer is the law of Wisconsin and, accordingly, reverse the trial court and over-rule the demurrer.

The problem is an old one. Courts have been seeking for many years to resolve equitably, and with some degree of certainty, the law determining rights of the parties when the wrong has been committed in a country or state outside of the forum.

"The courts of this country came to pass on the question of the law which determined the rights of the parties in case of a foreign tort, long before the automobile days; in fact, quite a while before the horse and buggy days. They took a position which was much simpler than the position which the English courts took later; and they held that the law of the place where the tort took place was the law which fixed the rights of the parties." [1]

However, Wisconsin was out of step with the nation generally, for as late as 1875 in *Anderson v. Milwaukee & St. P. R. Co.* (1875), 37 Wis. 321, 322, this court said:

[1] William Herbert Page, Conflict of Law Problems in Automobile Accidents, 1943 Wisconsin Law Review, 145, 150.

". . . a personal action, for personal injury [is] governed by the *lex fori*. This is almost too familiar a principle for discussion or authority."

However, our court in *Bain v. Northern Pacific R. Co.* (1904), 120 Wis. 412, 417, 98 N. W. 241, overruled *Anderson,* saying that it was,

". . . out of harmony with all decided cases in its reasoning, . . . [and] opposed to the most elementary principles of law . . ."

As the court in *Bain* overruled the chain of cases that preceded it, we now overrule *Bain* and the cases subsequent to it that hold that the proper choice-of-law rule invariably is *lex loci delicti.*

We believe that this will permit a reasonable and flexible approach that will allow the use of *lex loci delicti, lex fori,* or a combination of the two or the law of a third state if it is in the interests of sound legal administration and justice to do so. Instead of the rigidly applied rule of *lex loci,* we adopt a flexible but, we believe, a practical and workable principle to be used in solving "choice-of-law" problems.

The rule that we abandon has long been in disfavor with those who felt that it failed to give due consideration to the jurisprudential facts of life of the mid-twentieth century. Almost twenty-five years ago, Professor William Herbert Page in referring to the *lex loci* rule stated:

"The law of the ox-cart and sailing-vessel days has thus persisted through the horse-and-buggy days, into the railroad and street car days, and thence on into the automobile days." [2]

---

[2] 1943 Wisconsin Law Review, 145, 179, *supra.*

However, the mere fact that a rule is old does not make it bad. In fact, its antiquity is compelling evidence that it must have been reasonably satisfactory, and the rule, though old, should be retained if it continues to serve its purpose. We need, however, only to cite a few examples to see that the application of the rule of *lex loci* has on occasions produced absurd and unjust results. Consider the case of *Walton v. Arabian American Oil Co.* (2d Cir. 1956), 233 Fed. (2d) 541, in which an American citizen employed in Arabia was there injured as the result of the negligent operation of an automobile owned by an American corporation and operated by one of its employees. Suit was brought in an American court. That court held that the law that *must* be applied is the *lex loci,* the law of Saudi Arabia. Though under the laws of either the plaintiff's domicile or the forum, a cause of action was spelled out, the court directed a verdict for the defendant because it could not be shown that a cause of action existed under the laws of Saudi Arabia. The rule of *lex loci* may, and will frequently, produce a reasonable result. It did not in that case, and we reject the rule in its Draconic application.[3]

The rules of *stare decisis* attempt to give certainty to our law, so conduct can be planned in light of foreseeable legal consequences. Certainty, however, is less relevant in the law of unintentional torts, where conduct is not planned, than in the law of contracts or, more particularly, in the law of real property. In any event, the rule of *lex loci* has not produced certainty of result. From the earliest days, hard cases have produced deviations from the rule. New York at an

---

[3] In Wisconsin this result would not obtain, because we hold that where the foreign law is unknown, it is presumed to be the same as Wisconsin. See sec. 328.01, Stats., and *Harper v. Hartford Accident & Indemnity Co.* (1961), 14 Wis. (2d) 500, 111 N. W. (2d) 480.

early date refused to hear cases based on foreign law where the result would be contrary to the public policy of that state. *Gardner v. Thomas* (N. Y. 1817), 14 Johnson's Reports 134. It thus appears that *lex loci* frequently is not applied where the policy of the forum state is offended, or the conscience of the forum court is shocked. The original Restatement, Conflict of Laws, recognized this fact:

"No action can be maintained upon a cause of action created in another state the enforcement of which is contrary to the strong public policy of the forum." [4]

"The *lex loci delicti* rule leads to uniform treatment of a cause of action only to the extent that none of the possible forums has a strong public policy which would require a different result." [5]

*Haumschild v. Continental Casualty Co.* (1959), 7 Wis. (2d) 130, 95 N. W. (2d) 814, is an example of this type of exoneration from an unrealistically rigid rule. We there chose to obviate the public-policy conflicts between the law of Wisconsin and the law of California by holding that the question of interspousal immunity was a question of family law and not of tort law. Nevertheless, we said there, at page 138:

". . . this court should adopt the rule that, whenever the courts of this state are confronted with a conflict-of-laws problem as to which law governs the capacity of one spouse to sue the other in tort, the law to be applied is that of the state of domicile."

We therein quoted with approval from *Koplik v. C. P. Trucking Corp.* (1958), 27 N. J. 1, 141 Atl. (2d) 34, the statement:

[4] Page 731, sec. 612.
[5] 62 Michigan Law Review (1964), 1359.

" 'Otherwise, the *lex loci* will be permitted to interfere seriously with a status and a policy which the state of residence is primarily interested in maintaining.' " [6]

Since the rule of *lex loci* applied only to matters of substance and not of procedure, courts have, when confronted with an undesirable result, labeled the countervailing foreign law "procedural," thus giving lip service to *lex loci*, but obtaining the desired policy result. *Grant v. McAuliffe* (1953), 41 Cal. (2d) 859, 264 Pac. (2d) 944.

Bridges and Segal [7] summarized court experience with the present rule:

". . . courts . . . seek ways to escape such absurd results, and in practice various devices have been utilized to that end. Courts have resorted to characterization of the action as one of contract rather than tort or one involving matters of procedure rather than substance in order to apply the *lex fori* or another law which permits a just result. The place of wrong has been localized in a state with a favorable law and resort has been made to the doctrine of renvoi in order to apply a law other than that of the place of harm. Public policy has been held to require application of the *lex fori*, as has failure to plead and prove the law of the place of harm."

It appears therefore that *lex loci* has not provided a "fixed star," but rather has been merely a point of departure in hard cases. Willis Reese summarized the predicament of the courts on the predictability phase of the rule of *lex loci*:

". . . although predictability of result is important to the extent that it facilitates the lawyer's task in advising his client and negotiating a settlement, it is not an all-important value in torts since this is an area where persons will rarely, if ever, give advanced thought to the legal consequences of

---

[6] 7 Wis. (2d) 130, 136, 95 N. W. (2d) 814.
[7] Comment, 51 California Law Review (1963), 762, 770.

their actions. In any event, continued adherence to a bad rule is a high price to pay for predictability. Furthermore, it is doubtful whether a bad rule will provide predictability since the courts will be inclined to engraft exceptions upon it." [8]

It seems apparent that the rule as it now exists in Wisconsin has not produced the certainty that *stare decisis* contemplates. In addition, as we said in *Haumschild:*

". . . the rule being discarded is one lying in the field of conflict of laws as applied to torts so that there can hardly have been any action taken by the parties in reliance upon it." [9]

The cases that we overrule are the end product of an adherence to the rules of the Restatement, Conflict of Laws (1934), p. 457, sec. 378, provides:

"The law of the place of the wrong determines whether a person has sustained a legal injury."

The great weight of authority in this country still follows this rule.[10] Upon a reading of these cases, which on their face offer a deceptively simple solution to a complex problem, we are reminded of the words of Mr. Justice BENJAMIN N. CARDOZO, ". . . it is easier to follow the beaten track than it is to clear another." [11]

The path, however, has been departed from in recent cases in other jurisdictions. Cases in which courts have done so are *Babcock v. Jackson* (1963), 12 N. Y. (2d) 473, 240 N. Y. Supp. (2d) 743, 191 N. E. (2d) 279, 95 A. L. R.

---

[8] Comments on *Babcock v. Jackson,* 63 Columbia Law Review (1963), 1212, 1254.

[9] 7 Wis. (2d) 130, 137, 95 N. W. (2d) 814.

[10] For a recent compilation of the jurisdictions that apply the *lex loci* rule, see Anno. 95 A. L. R. (2d) 12.

[11] CARDOZO, The Growth of the Law (1924), page 62.

(2d) 1; *Griffith v. United Air Lines, Inc.* (1964), 416 Pa. 1, 203 Atl. (2d) 796; and *Kilberg v. Northeast Airlines* (1961), 9 N. Y. (2d) 34, 10 App. Div. (2d) 261, 172 N. E. (2d) 526; *Gianni v. Fort Wayne Air Service, Inc.* (7th Cir. 1965), 342 Fed. (2d) 621; and *Watts v. Pioneer Corn Co.,* (7th Cir. 1965), 342 Fed. (2d) 617. The authors of these decisions, the latter two written by United States District Judge KENNETH GRUBB sitting on the circuit court of appeals, and the writers and commentators have been active in the criticism of the Restatement rule. See Albert A. Ehrenzweig in 69 Yale Law Journal (1960), 595, Guest Statutes in the Conflict of Laws—Towards a Theory of Enterprise Liability under "Foreseeable and Insurable—Laws;" Brainard Currie in 10 Stanford Law Review (1958), 205, Survival of Actions: Adjudications versus Automation in the Conflict of Laws; and Russell J. Weintraub in 48 Cornell Law Quarterly (1963), 215, A Method for Solving Conflict Problems—Torts.

Many different approaches have been recommended in the area of choice of laws.[12] Brainard Currie advances a governmental interest theory [13] which requires the forum state to apply its law if it has any legitimate policy interest. The *lex loci* should be applied only if the forum has no interest. He urges that if the forum state has no legitimate interest and if other states have competing interests, then the law of the forum should govern.

For Professor Ehrenzweig the starting point must be the law of the forum.[14] He takes the view that the basic rule in the conflicts law of torts refers to the *lex fori.* From this

[12] In discussing these theories, we do not mean to intimate that we intend to follow any of them in their entirety.

[13] 1959 Duke Law Journal, 171, Notes on Methods and Objectives in the Conflict of Laws.

[14] Albert A. Ehrenzweig, 69 Yale Law Journal (1960), 595.

starting point he looks in each situation to the development of a common law of conflicts, based on "consistent judicial practice" to provide exceptions to the basic rule. He envisages that this approach will actually promote application of foreign law and relegate the *lex fori* to mere analytical primacy because deviations will not occur, in his view, except when "compelling reasons" for such deviations exist. In cases of enterprise liability, Ehrenzweig believes that " 'compelling reasons' exist when the *lex fori* is not a 'foreseeable and insurable' law." [15]

Weintraub, 48 Cornell Law Quarterly (1963), 215, suggests the following approach in the choice of law. The court must first identify the apparent conflict and determine whether it is in fact real or spurious. If no conflict is found, then the law of the forum should be used. Once a conflict is isolated, Weintraub, in a summary of his position, *supra* at page 244, suggests that the actor be found liable for his conduct under the laws of any state whose interest would be advanced significantly by imposing liability, unless the imposition of liability would unfairly surprise the actor. His final step in the analysis suggests that when the policies of the interested or contact states are not applicable to the case before the court, then the forum state should consider arriving at a result that would insulate the result from the selection of the forum, *i.e.*, prevent future actions from being decided merely by the choice of the forum. Weintraub maintains that this last step is the answer to the criticism of "forum shopping" raised by objectors to the choice of law proposals made by writers and commentators. [16]

---

[15] 51 California Law Review (1963), 762, 783.

[16] Sparks, 31 Insurance Counsel Journal (1964), 428, *Babcock v. Jackson*—A Practicing Attorney's Reflection Upon the Opinion and Its Implication.

The Tentative Draft No. 9 of the Restatement, Conflict of Laws, (2d) p. 3, sec. 379, now provides that, "the local law of the state which has the most-significant relationship with the occurrence and with the parties determines" the rights and liabilities of the parties. The Draft then lists the contacts that determine "the state of most-significant relationship." These are: Place of the injury; the place of the conduct; the domicile, nationality, place of incorporation and place of business of the parties; and the place where the relationship of the parties is centered.[17] Sec. 379a provides:

"In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless some other state has a more significant relationship with the occurrence and the parties as to the particular issue involved, in which event the local law of the latter state will govern."[18]

Other jurisdictions have recently rejected the *lex loci* rule. New York, on facts similar to those before us, has applied its law to a one-car accident in Ontario where the litigants were New York residents, the insurance company did business in New York, and the parties were on a trip that began and ended in New York.[19] The New York law allowed a suit in ordinary negligence, while Ontario law prohibited all host-guest liability.

Minnesota refused to follow the *lex loci* rule where the accident occurred in Wisconsin between Minnesota residents and the conduct (sale of liquor to an intoxicated person)

[17] Sec. 379.

[18] See 51 California Law Review (1963), 762, The Second Conflicts Restatement of Torts: A Caveat.

[19] *Babcock v. Jackson, supra.* See 63 Columbia Law Review (1963), 1212, Comments on *Babcock v. Jackson,* A Recent Development in Conflict of Laws; 1964 Wisconsin Law Review, 316, *Babcock v. Jackson:* A Possible Solution to Conflicts Confusion in Wisconsin.

took place in Minnesota.[20] Minnesota holds the seller of liquor responsible under a dram-shop act, while Wisconsin does not.

Pennsylvania has refused to apply a Colorado limitation in a survival action by the executor of the estate of a Pennsylvania resident killed in an airplane crash in Colorado.[21] Pennsylvania law permits the executor to recover future earnings after death, but Colorado does not.

New York was also unwilling to limit the recovery in a wrongful-death action to an arbitrary ceiling of $15,000 set by Massachusetts for a fatal aircraft accident in Massachusetts even though the action was brought in New York under the Massachusetts wrongful-death statute.[22] According to the reasoning of the New York court, the limit set by Massachusetts was in conflict with the New York public policy which set no such limit and the court, therefore, would not apply that part of the Massachusetts law.

California has ruled that the law of the place of the accident (Arizona, which does not permit an action for damages against a deceased tort-feasor) would not govern the action by the injured party against the decedent.[23]

All of the commentators and all of the cases that end up in disagreement with the unbending application of *lex loci* have a common thread that runs through the skein of rationale, and that thread is that the place of the occurrence of an unintentional tort is fortuitous, and it is by mere happenstance that the *lex loci* state is concerned at all. The most-dramatic instance of this type of fortuitousness is the case where an

---

[20] *Schmidt v. Driscoll Hotel Inc.* (1957), 249 Minn. 376, 82 N. W. (2d) 365.

[21] *Griffith v. United Air Lines, Inc., supra.*

[22] *Kilberg v. Northeast Airlines, Inc., supra.*

[23] *Grant v. McAuliffe, supra.*

airplane is forced off its course and crashes in a state or country that was not on its route.[24]

They are also dismayed that in this day of rapid transportation, whether by land or air, the rights and liabilities of the parties as to each other should vary from hour-to-hour, or indeed minute-to-minute, as state boundaries are crossed. In the case before us the parties, husband and wife, passed through a number of states on their vacation. There appears to be no reason why the duty of the host to the guest should vary on the basis of factors that are not in anywise related to the public policy of the state most intimately concerned or associated with a changed relationship between the parties.

We have long shown concern over this petrified approach to conflicts problems. In *Haumschild v. Continental Casualty Co., supra,* we indicated our dissatisfaction with the "place of wrong" rule that ignores fundamental policies of the state most intimately concerned.

In 1963 in *Wojciuk v. United States Rubber Co.,* 19 Wis. (2d) 224, 235c, 120 N. W. (2d) 47, 121 N. W. (2d) 294, 122 N. W. (2d) 737, footnote 7, we commented on the recent trend toward a less mechanical application of a choice of law rule.

In *Brunke v. Popp* (1963), 21 Wis. (2d) 458, 124 N. W. (2d) 642, we referred to *Babcock v. Jackson's* resolution of its choice-of-law problem on the basis of the state that had the most-significant relationship. We pointed out that the rule was not applicable in *Brunke* since Jane Brunke and Fredy Garces were nonresidents.

Our recently adopted Uniform Commercial Code, sec. 401.105, Stats., recognizes an "appropriate relations" test for determining applicable law, and the official Uniform Commercial Code comments refer to a transaction's "significant contacts" as being factors in the choice of law. This

---

[24] *Carter v. Tillery* (Tex. Civ. App. 1953), 257 S. W. (2d) 465.

in itself indicates legislative approval of the Restatement rule of "most-significant relationship."

As foreshadowed by the three cases referred to above, we adopt the general principles of the commentators and result of the cases critical of the *lex loci* rule in that we believe that in order to determine the "most-significant relationship" consideration should be given to the policies and interests of the forum state, the tort state, and of other states that may have an interest by virtue of the domicile of the parties or other relevant factors. It is obvious that one state may have a legitimate concern with one facet or issue of the case, but not with another, and hence we conclude that it is not necessary in each case to apply only the law of a single state to all phases of the lawsuit, *i.e.,* what is negligence, for example, may well involve the application of the rules of the road of the tort state since it is that state that is primarily concerned with safety on its highways.

However, the *degree* of negligence (*i.e.,* gross or ordinary) necessary to ensure recovery may be unrelated to the policies of the tort state, but highly relevant to the policy of the forum state and as to that issue the law of the forum would govern.

As set forth in the digest of the facts, we are here concerned with a situation in which the plaintiff and defendants are Wisconsin residents, who were on a trip that commenced in Wisconsin and was intended to end there. The policy of insurance was issued by a Wisconsin domiciled and licensed company, delivered in Wisconsin to afford coverage on an automobile licensed in Wisconsin and usually garaged and operated in Wisconsin.

The law of Wisconsin permits a guest to recover from a host upon the pleading and proof of ordinary negligence. It is the policy of our law to provide compensation to a person when he has been negligently injured. The reasons for this

policy are manifold. Among them are that the wrongdoer should bear the cost of an injury because of his causal fault and not the injured party (unless he is equally at fault) or the state authorities or those who have furnished medical services, and that to the extent that damages in a negligence action are punitive, it is hoped that the burden of a judgment may deter like conduct by others.

The law of Nebraska permits a recovery only if the guests plead and prove that the host was guilty of gross negligence. What policy of Nebraska does such a rule of law serve? It would appear that its principal purpose is a negative one. It provides a limitation (in a quantum-of-proof sense) of the right of recovery of the guest from the host. Since Nebraska law permits a greater degree of negligence before imposing civil liability, it is obvious that the purpose of the rule is not to penalize misconduct that amounts to ordinary negligence, hence the application of Nebraska law in the instant case can hardly be said to further the safe use of Nebraska highways. The general purpose of a guest statute of the Nebraska type is said to be for the purpose of preventing the ingratitude of a gratuitous guest who sues his kindly host or for the purpose of limiting the opportunity for collusive host-guest suits, and, in addition with considerable respectable authority, the purpose is said to be the protection of the host and his insurer from judgments.[25]

But to the extent that such is the purpose of the law, it is the Nebraska host and his insurance company that are the objects of that legal policy. Nebraska policy is not concerned with a suit against a Wisconsin host or a Wisconsin insurer.

All of the parties, including the liability insurer, are domiciled in Wisconsin. None of them can claim surprise upon permitting a suit for ordinary negligence between host and guest. This is the law that in the ordinary course of events would have been applied if the accident had occurred

---

[25] *Weintraub,* 48 Cornell Law Quarterly (1963), 215, 220, 228.

in Wisconsin. That it occurred outside was merely fortuitous, and should not now inure as a windfall to any of the defendants. The policy was issued for a Wisconsin-garaged automobile in contemplation of possible liability under Wisconsin law, and we find that the insurer in this case is bound by his bargain. The law of Wisconsin is the law of the place whose application was "anticipated and insured against." [26]

Courts are instruments of state policy and it is for the legislature, when it has spoken, subject to the constitution, to determine the legal standards to be applied in allowing recovery in a negligence case. Our legislature has not seen fit to require that a host be grossly negligent for a guest to recover. Where all the policy factors combine in the determination that Wisconsin is the state most intimately and significantly concerned with the disposition of an issue in a lawsuit, it would be contrary to our legislative policy to apply other than Wisconsin law to the issues thus affected.

In putting aside the common law of *lex loci*, we do so in the belief that the rule contemplated by the current Draft No. 9 of the Restatement of Conflicts, as well as *Babcock, supra,* and *Griffith, supra,* will result in a common law of conflicts that will be administered with uniformity as jurisdictions generally adopt this rule. To arrive at such uniformity requires an analysis on a consistent basis so that a similar fact situation will result in a similar determination. We adopt the following analysis.

For the problem of choice of law to arise there must be contact with one or more states. The proposed Draft of the Restatement, (2d), *supra,* lists contacts that in *some* cases may be controlling. We conclude that the mere counting of contacts should not be determinative of the law to be applied. It is rather the relevancy of the contact in the terms of policy considerations important to the forum, *vis-a-vis,* other con-

---

[26] Ehrenzweig, 69 Yale Law Journal (1960), 595, 603.

tact states. We start with the premise that if the forum state is concerned it will not favor the application of a rule of law repugnant to its own policies, and that the law of the forum should presumptively apply unless it becomes clear that non-forum contacts are of the greater significance. In the instant case the facts indicative of the most-significant relationship are that both host and guest are residents of Wisconsin, that the relationship arose in this state, that the insurance was issued here, by a Wisconsin company for a Wisconsin-garaged automobile, and that it is the policy of this state to compensate guests for injuries sustained as the result of the ordinary negligence of their hosts. Wisconsin is concerned because the parties are domiciled here. The policy of Nebraska in the instant case will not be served by applying Nebraska law in regard to the standard of care since the Nebraska contact, the place of the accident, is not relevant to Nebraska's policy of protecting a Nebraska host from an ungrateful guest or protecting a Nebraska insurance company when all concerned are residents of Wisconsin. In the event this case should go to trial, the fact that the accident did occur in Nebraska might well become a relevant contact insofar as Nebraska's rules of the road become a factor. Nebraska's policy is served by enforcing its rules of the road and Wisconsin policy is unaffected. Hence, in this respect, the place of accident may be relevant at trial though not on the present demurrer.

The concern, therefore, of the courts must not be merely with the contacts quantitatively, but with them qualitatively in light of policy considerations. We therefore conclude that we cannot accept invariably the order of importance that the Tentative Draft No. 9 of the Restatement of Conflicts has assigned to various contacts, although in general we agree with the order of importance assigned. However, the weight depends on their relevancy to the policies of the place of the wrong and the forum. "This rule recognizes the most

significant relationship with the occurrence and the parties and important contacts as more properly controlling than 'wooden applications' (an expression used by some writers) of the strict *lex loci delicti* rule." *Fabricius v. Horgen* (Iowa, 1965), 132 N. W. (2d) 410.

Other courts applying a similar reasoning have referred to their solution as a "center of gravity" or a "grouping of contacts." While these phrases have been labeled as "mere catchwords," they are, when applied in connection with the case to which they were originally used, meaningful "short-hand" phrases for the expression of the rule that we adopt.

The neat answer of the law of *lex loci,* by this opinion, takes its place in the netherworld of jurisprudence. It will have its mourners and, for a time, it will be sorely missed, but it is to be expected that on a case-by-case-basis generalizations will soon become apparent and will take its place as a guide to the future to provide a uniform common law of conflicts. It is not to be expected, however, that this approach will provide the *vade mecum* for the quick sure answer provided heretofore by *lex loci* and the theory of vested rights. But the very purpose of this method is to avoid the pat answer that gives a bad result either to be accepted as a sacrifice on the altar of certainty or to be avoided by subterfuge. It is to be hoped that the approach set forth herein will enable courts to face the facts as they exist and to make their determinations on a rational rather than mechanical basis. As Mr. Justice CARDOZO stated:

"We shall have to feel our way here as elsewhere in the law. Somewhere between worship of the past and exaltation of the present, the path of safety will be found." [27]

*By the Court.*—Order reversed, and cause remanded for further proceedings not inconsistent with this opinion.

[27] CARDOZO, The Nature of the Judicial Process (1921), page 160.