Mabel M. Graham, Plaintiff-Appellant, v. General U. S. Grant Post No. 2665, a VFW of the United States, a Corporation, Rossetta Young Allan, De Loss Allan and Ray Glick, d/b/a Silver Dollar Tap, and Edward J. Bussan, Mary Bussan, and Anne Herman, d/b/a Gay Nineties, Defendants-Appellees.

Gen. No. 67–169.

Second Judicial District.

July 24, 1968.

Rehearing denied and opinion modified September 19, 1968.

MORAN, J., dissenting.

Roszkowski and Paddock, of Rockford, for appellant.

Nack, Richardson & Nack, of Galena, for appellees.

MR. JUSTICE DAVIS delivered the opinion of the court.

On the motion of the defendants—the owners and operators of three taverns located at Galena, Illinois—, the Circuit Court of the Fifteenth Judicial Circuit entered an order dismissing the plaintiff's amended complaint. The plaintiff appealed.

The pertinent facts as alleged in the amended complaint are: On May 1, 1966, the defendants were in the business of selling liquor at retail at Galena, and sold liquor to Jack Schleicher, which caused his intoxication in whole or in part. At nine o'clock that evening in Grant County, Wisconsin, near the Illinois-Wisconsin line, while intoxicated, and as a direct result thereof, Schleicher drove his automobile in such a manner to cause it to collide with the automobile driven by plaintiff, and thereby severely injured her.

Count I alleged a cause of action against the defendants under section 14 of Article VI of the Liquor Control Act, commonly known as the Dram Shop Act (Ill Rev Stats 1965, c 43, par 135). Count II alleged a common-law negligence action which specified five negligent acts or omissions of the defendants in serving liquor to Schleicher while he was intoxicated.

At the oral argument of the case it was agreed that Illinois was the place of residence of the plaintiff, the individual defendants, and Schleicher, and was the sole place of business of the corporate defendant.

The issues presented are:

(1) Whether the owners and operators of the three Illinois taverns are liable under the Illinois Dram Shop Act for injuries inflicted upon the plaintiff, an Illinois resident, by a drunken driver, also a resident of Illinois, whose intoxication resulted from the purchase of alcoholic bev-

141

erages from the Illinois taverns, notwithstanding the fact that the accident occurred a short distance within the boundaries of the State of Wisconsin; and

(2) Whether a common-law cause of action may lie against the three Illinois tavern owners and operators that knowingly and negligently served alcoholic beverages to an intoxicated person who thereafter inflicted injuries upon the plaintiff.

The first issue requires a determination of the extraterritorial effect of the Illinois Dram Shop Act; and the resolution of the second issue will depend upon whether the Illinois Courts are required to apply Wisconsin law, or may, in view of the fact that the plaintiff and the defendants are all residents of this State, apply the common law of this forum in determining whether a common-law cause of action exists.

Section 14 of Article VI of the Liquor Control Act provides in pertinent part:

"Every person who is injured in person or property by any intoxicated person, has a right of action in his own name . . . against any person who by selling or giving alcoholic liquor, causes the intoxication, in whole or in part of such person."

And Section 1 of Article I of the Liquor Control Act provides:

"This Act shall be liberally construed, to the end that the health, safety and welfare of the People of the State of Illinois shall be protected and temperance in the consumption of alcoholic liquors shall be fostered and promoted by sound and careful control and regulation of the manufacture, sale and distribution of alcoholic liquors." (Ill Rev Stats 1965, c 43, par 94.)

■ ■ It would thus appear that the Illinois Dram Shop Act is primarily an exercise of police power by the State, whereby the legislature sought to inhibit the sale of liquor to the extent that it causes intoxication, and that to achieve this, a penalty in the form of absolute liability is inflicted. The purpose of the Act seems to embrace both the regulation of the liquor traffic and redress for injury.

In Hernandez v. Diaz, 31 Ill2d 393, 202 NE2d 9 (1964), at page 399, the court stated:

"The statute was designed to give a substantial remedy and should be allowed to have effect according to its natural and plain meaning. Section 1 of article 1 of the Liquor Control Act states that the act shall be liberally construed to the end that the health, safety and welfare of the people of the State of Illinois shall be protected. Ill Rev Stats 1963, c 43, par 94.

"It is clear that the legislature had the intention of protecting innocent parties from the acts of intoxicated persons."

The court, in Hernandez, liberally construed the Act by holding that if an intoxicated person commits an act which has a direct causal relation to the injury of another, the injury is caused "by" the intoxicated person. The court illustrated the effect of its holding by stating that if a drunken driver causes an innocent driver to leave the highway and injure a pedestrian, the pedestrian has been injured by the intoxicated person as much as if his vehicle had struck the injured person.

In Lichter v. Scher, 11 Ill App2d 441, 138 NE2d 66 (1956), the court, in discussing the purpose of the Act, stated at page 452:

"The Dram Shop Act is unique. . . . , it is designed to discipline a legal but ill-favored trade. While it

applies a remedy to mitigate the evils and dangers that flow from the liquor traffic, it is a remedy not necessarily based on fault or negligence. The owner of the premises or anyone who leases them, as well as the dramshop keeper, may become liable even though the sale was made to a customer when he was wholly sober, if the customer thereafter by drinks purchased elsewhere became intoxicated. It is therefore penal in a severe sense in its obvious purpose of subjecting to strict discipline those who embark in the liquor traffic and even those who as lessors or owners permit premises to be so used. It is true that in some cases courts have described the Act, insofar as it relates to damages, as remedial; that is to say, recovery is intended to reimburse for losses sustained by the evils growing out of the liquor traffic. This does not change the essentially disciplinary and regulatory character of the Act."

However, the court in Howlett v. Doglio, 402 Ill 311, 83 NE2d 708 (1949), at page 318, stated:

"Although the Dram Shop Act is penal in character and should be strictly construed, (Cruse v. Aden, 127 Ill 231; Meidel v. Anthis, 71 Ill 241,) the legislation is, at the same time, remedial and should be so construed as to suppress the mischief and advance the remedy. (Citations.)"

In Miller v. Owens-Illinois Glass Co., 48 Ill App2d 412, 420, 199 NE2d 300 (1964) and in cases cited therein, the court stated that the Illinois Dram Shop Act is in derogation of the common law, and like other such statutes, should be strictly construed. Thus, the expressions of our courts with reference to how the Act should be construed, are, at least, ambiguous.

The Supreme Court of Illinois has not determined whether the Illinois Dram Shop Act has extraterritorial

144

effect, other than by denial of petition for leave to appeal in Colligan v. Cousar, 38 Ill App2d 392, 187 NE2d 292 (1963), and in Eldridge v. Don Beachcomber, Inc., 342 Ill App 151, 95 NE2d 512 (1950). The Appellate Court, however, has repeatedly held that the Dram Shop Act has no such effect. Colligan v. Cousar, supra, 403; Butler v. Wittland, 18 Ill App2d 578, 583, 153 NE2d 106 (1958); Eldridge v. Don Beachcomber, Inc., supra, 154.

In Rubitsky v. Russo's Derby, Inc., 70 Ill App2d 482, 216 NE2d 680 (1966), which was decided by this court, we stated as obiter dictum, at page 484:

> "The law, often criticized in Illinois, is that the Dram Shop Act has no extraterritorial effect and hence would not apply to a situation, such as this one, where the injuries were sustained beyond the jurisdiction of the state."

Butler and Eldridge were cited in Rubitsky as authority for this legal proposition. Eldridge does not recite the place of residence of the plaintiff, while in Butler, the parties litigant were all Illinois residents. Thus, Eldridge appears to have differed factually from the case at bar in which the plaintiff, the defendants, and the drunken driver, were all Illinois residents.

In Eldridge, the court followed Goodwin v. Young, 34 Hun (NY) 252, an 1884 decision, wherein a resident of Vermont sued the operator of a New York dramshop, who sold the plaintiff's servant liquor, which caused his intoxication, the neglect of plaintiff's team of horses and the death of one horse as the result thereof, upon the servant's return to Vermont. The court, in Eldridge, treated the act of injury to the plaintiff as the tortious conduct which gave rise to liability and held that since the injury occurred outside of Illinois, the Illinois Dram Shop Act was not applicable. The court did not consider the sale of liquor to be wrongful in that at common

law it was not a tort either to sell or give away liquor to "a strong and able-bodied man." Howlett v. Doglio, supra, 318; Cruse v. Aden, 127 Ill 231, 234, 20 NE 73 (1889).

Eldridge also relied on the rule of statutory construction announced in Union Bridge & Construction Co. v. Industrial Commission, 287 Ill 396, 398–400 incl., 122 NE 609 (1919) and in Dur-Ite Co. v. Industrial Commission, 394 Ill 338, 348, 349, 68 NE2d 717 (1946), where suits were brought under the Illinois Workmen's Compensation and the Occupational Diseases Act, respectively. In each case, the petitioner entered into a contract of employment in Illinois but was injured or contracted an occupational disease in another state, and the court held that there was no cause of action in Illinois because the Acts had no extraterritorial effect. The court raised the presumption that where a statute is silent as to its extraterritorial effect, it is presumed to have none.

As originally enacted, the title of the 1913 Workmen's Compensation Act omitted any reference to injuries or death suffered outside the State. By amendment effective July 1, 1925, the title to the 1913 Act was amended by inserting immediately following the words "within this State," the phrase: "and without this State where the contract of employment is made within this State," and in 1951 a complimentary amendment was added to the Act as section 1(b)(2) (Ill Rev Stats 1951, c 48, par 138.1(b)(2)), which defined the term "employee" as:

> "Every person in the service of another under any contract of hire, express or implied, oral or written, including persons whose employment is outside of the State of Illinois where the contract of hire is made within the State of Illinois, . . . ."

Thus, the legislature acted to remove the limitation placed on the Act by the Union Bridge case which was

decided in 1919; and the Supreme Court has held that the 1951 Act was not unconstitutional in that a law effective in this State may create rights and liabilities arising from acts occurring outside of the State. Kennedy-VanSaun Manufacturing & Engineering Corp. v. Industrial Commission, 355 Ill 519, 523, 189 NE 916 (1934); Beall Bros. Supply Co. v. Industrial Commission, 341 Ill 193, 199, 173 NE 64 (1930).

The Workmen's Occupational Diseases Act does not provide compensation for disability and death occurring without the State even though the contract of employment was made within the State. Dur-Ite Co. v. Industrial Commission, supra. Thus, the same legislature which acted rather promptly to give extraterritorial effect to the Workmen's Compensation Act, has allowed 17 years to pass without amending the Workmen's Occupational Diseases Act to accomplish such end. However, the Occupational Diseases Act has the same policy and purpose as the Compensation Act. The divergent action of the legislature with reference to these similar acts would seem to substantially weaken the presumption rationale of the Eldridge decision.

Accordingly, it would seem unrealistic to presume that when the legislature amended the Dram Shop Act in 1955, that by silence it intended to approve the Eldridge construction of the Act. As pertinently stated in Nudd v. Matsoukas, 7 Ill2d 608, 131 NE2d 525 (1956), at page 615: "We are indeed treading on dangerous ground when we purport to judge the judicial soundness of our prior opinions by the presence or absence of corrective.legislation."

A construction of the Illinois Dram Shop Act as a regulatory measure and as an exercise of police power by the legislature which would warrant the allowance of a cause of action in Illinois, regardless of where the injury occurred, is not without analogous precedent. In Val Blatz

147

Brewing Co. v. Gerard, 201 Wis 474, 230 NW 622 (1930), the court noted that the Wisconsin Act "contains no language from which it may be inferred that its application was intended to be limited to injuries which occur within the state," and at page 625 the court stated:

". . . The State has such an interest in the welfare and protection of its citizens and of those dependent upon them that it may, in the exercise of the police power extend the protection of its Compensation Act to citizens of the state who are injured while performing service outside its boundaries."

▓ The Illinois Dram Shop Act created liability in an area where none existed at common law. Howlett v. Doglio, supra; Cruse v. Aden, supra. Wisconsin has no comparable Dram Shop Act and under Wisconsin law there is no common-law liability for the sale or gift of liquor to an able-bodied man. Thus, absent a holding that the Illinois Dram Shop Act has extraterritorial effect and that we will not follow the existing conflicts rules of tort in multistate situations the plaintiff will suffer because the legislature, through inadvertency or lack of foresight, failed to except the statute from the operation of such conflict of law rules, or to give the statute extraterritorial operation.

We believe that the wrong contemplated by the Act, at least to the extent that it is regulatory in nature, is consummated when an owner or operator of a tavern sells or gives liquor to any person which causes the intoxication of such person, in whole or in part. Thus, all contributing sales become wrongful at the instant the intoxication results, and the wrongful conduct, at least from the regulatory aspect, is then complete. Under this view, the location of any injury caused by the intoxication, either within or without the State, is irrelevant. If a cause of action is denied because of the rule of extraterritorial-

148

ity, a defendant is allowed to offend the Act and yet escape its penalties, and the injury or damage to one whom the Act is designed to protect remains unredressed.

If we give extraterritorial effect to the Act, the result creates a conflict with the traditional choice of law rule, found in the original Restatement of Conflict of Laws (§§ 377 and 378), and followed by the Illinois Courts (see: Opp v. Pryor, 294 Ill 538, 540, 128 NE 580 (1920); Millsap v. Central Wisconsin Motor Transp. Co., 41 Ill App2d 1, 8, 189 NE2d 793 (1963); Colligan v. Cousar, supra; Butler v. Wittland, supra). Such rule has been lex loci delicti—that the substantive rights and liabilities arising out of a tortious occurrence are determined by the law of the place of the tort. The rationale of the rule is that its mechanical simplicity, with the assumed predictability of results as a corollary, is of first importance.

In Babcock v. Jackson, 12 NY2d 473, 240 NYS2d 743, 191 NE2d 279 (1963), the court, in considering such rule, at page 281 stated:

"It had its conceptual foundation in the vested rights doctrine, namely, that a right to recover for a foreign tort owes its creation to the law of the jurisdiction where the injury occurred and depends for its existence and extent solely on such law. (See Hancock, Torts in the Conflict of Laws (1942), pp 30–36; Reese, The Ever Changing Rules of Choice of Law, Nederlands Tijdschrift Voor International Recht (1962), 389.) Although espoused by such great figures as Justice Holmes (see Slater v. Mexican Nat. R. Co., 194 US 120, 24 S Ct 581, 48 L Ed 900) and Professor Beale (2 Conflict of Laws (1935), pp 1286–1292), the vested rights doctrine has long since been discredited because it fails to take account of underlying policy considerations in evaluating the signifi-

cance to be ascribed to the circumstance that an act had a foreign situs in determining the rights and liabilities which arise out of that act.[3] 'The vice of the vested rights theory,' it has been aptly stated, 'is that it affects to decide concrete cases upon generalities which do not state the practical considerations involved.' (Yntema, The Hornbook Method and the Conflict of Laws, 37 Yale LJ 468, 482–483.) More particularly, as applied to torts, the theory ignores the interest which jurisdictions other than that where the tort occurred may have in the resolution of particular issues. It is for this very reason that, despite the advantages of certainty, ease of application and predictability which it affords (see Cheatham and Reese, Choice of the Applicable Law, 52 Col L Rev 959, 976), there has in recent years been increasing criticism of the traditional rule by commentators [4] and a judicial trend towards its abandonment or modification." [5]

[3] (See Cavers, A Critique of the Choice-of-Law Problem, 47 Harv L Rev 173, 178; Cheatham, American Theories of Conflict of Laws: Their Role and Utility, 58 Harv L Rev 361, 379–385; Cook, The Logical and Legal Bases of the Conflict of Laws, 33 Yale LJ 457, 479 et seq.; Hill, Governmental Interest and the Conflict of Laws, 27 U Chi L Rev 463; Lorenzen, Territoriality, Public Policy and the Conflict of Laws, 33 Yale LJ 736, 746–749; Yntema, The Hornbook Method and the Conflict of Laws, 37 Yale LJ 468, 474 et seq.)

[4] (See Dicey, Conflict of Laws (7th ed, 1958), p 937 et seq.; Leflar, The Law of Conflict of Laws (1959), p 217 et seq.; Stumberg, Principles of Conflict of Laws (2d ed, 1951), p 201 et seq.; Morris, The Proper Law of a Tort, 64 Harv L Rev 881; Ehrenzweig, Guest Statutes in the Conflict of Laws, 69 Yale LJ 595; Currie, Survival of Actions: Adjudication versus Automation in the Conflict of Laws, 10 Stan L Rev 205.)

[5] (See, e. g., Richards v. United States, 369 US 1, 12–13, 82 S Ct 585, 7 L Ed2d 492; Grant v. McAuliffe, 41 Cal2d 859, 264 P2d 944, 42 ALR2d 1162; Schmidt v. Driscoll Hotel, 249 Minn 376, 82 NW2d 365; Haumschild v. Continental Cas. Co., 7 Wis2d 130, 95 NW2d 814.)

Tentative Draft No. 9 of section 379 of the Restatement of Conflict of Laws has recognized the growing dissatisfaction with the application of the rule of lex loci delicti in multistate tort situations. In its present form it provides:

"(1) The local law which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort.

"(2) Important contacts that the forum will consider in determining the state of the most significant relationship include:

"(a) The place where the injury occurred.
"(b) The place where the conduct occurred.
"(c) The domicile, nationality, place of incorporation and place of business of the parties.
"(d) The place where the relationship of the parties is centered.

"(3) In determining the relative importance of the contacts, the forum will consider the issues, the character of the tort, and the relevant purposes of the tort rules of the interested states." (See: Balts v. Balts, 273 Minn 419, 142 NW2d 66 (1966) at page 69.)

In Griffith v. United Air Lines, Inc., 416 Pa 1, 203 A2d 796 (1964), at page 801, the court stated:

"This place of the injury rule, sometimes termed the lex loci delicti rule, has been the subject of severe criticism in recent years. See, e. g., Restatement (Second), Conflict of Laws, Introductory Note No. 1 (Tent Draft No. 9, 1964); Stumberg, Conflict of Laws 199–212 (3d ed 1963); Cavers, 'A Critique of the Choice-of-Law Problem,' 47 Harv L Rev 173 (1933); Cheatham & Reese, 'Choice of the Applicable

Law,' 52 Colum L Rev 959 (1952); Currie in 'Comments on Babcock v. Jackson, A Recent Development in Conflict of Laws,' 63 Colum L Rev 1212, 1233 (1963) (hereafter 'Comments on Babcock v. Jackson'); Ehrenzweig, 'The "Most Significant Relationship" in the Conflicts Law of Torts,' 28 Law & Contemp Prob 700 (1963); Harper, 'Policy Bases of the Conflict of Laws: Reflections on Rereading Professor Lorenzen's Essays,' 56 Yale LJ 1155 (1947); Morris, 'The Proper Law of a Tort,' 64 Harv L Rev 881 (1951); Reese in 'Comments on Babcock v. Jackson,' 63 Colum L Rev 1212, 1251 (1963); Traynor, 'Is This Conflict Really Necessary?' 37 Texas L Rev 657 (1959); and authorities cited in 46 Cornell LQ 637, 640, n 20 (1961) and 62 Mich L Rev 1358, n 3 (1964).

"The basic theme running through the attacks on the place of the injury rule is that wooden application of a few overly simple rules, based on the outmoded 'vested rights theory,' cannot solve the complex problems which arise in modern litigation and may often yield harsh, unnecessary and unjust results."

The above decisions and the treatises referred to therein identify many other choice influencing considerations which we regard as more significant than predictability of results. Also see: Wilcox v. Wilcox, 26 Wis2d 617, 133 NW2d 408 (1965); Schmidt v. Driscoll Hotel, 249 Minn 376, 82 NW2d 365 (1957); Kuchinic v. McCrory, 422 Pa 620, 222 A2d 897 (1966); Zucker v. Vogt, 200 F Supp 340 (1961); Kilberg v. Northeast Airlines, Inc., 9 NY2d 34, 211 NYS2d 133, 172 NE2d 526 (1961); Grant v. McAuliffe, 41 Cal2d 859, 264 P2d 944 (1953).

The Cheatham & Reese summary of nine policy factors affecting choice-of-law rules and results include the basic

factors from which any analysis of choice-influencing considerations must commence. They are:

"(1) The needs of the interstate and international systems;

"(2) A court should apply its own local law unless there is good reason for not doing so;

"(3) A court should seek to effectuate the purpose of its relevant local law rule in determining a question of choice of law;

"(4) Certainty, predictability, uniformity of result;

"(5) Protection of justified expectations;

"(6) Application of the law of the state of dominant interest;

"(7) Ease in determination of applicable law, convenience of the court;

"(8) The fundamental policy underlying the broad local law field involved;

"(9) Justice in the individual case."

(See: Cheatham & Reese, Choice of the Applicable Law, 52 Columbia L Rev 959 (1952).) Other eminent authors, referred to in Griffith v. United Air Lines, Inc., supra, have expanded or restricted the list of factors which they consider relevant in the choice-of-law process. We believe that an identification of the choice-influencing considerations will aid in the ultimate achievement of predictability for some type of transactions. Thus, it would seem advisable for each decision to forthrightly assert the basic factors underlying its rationale.

In the case at bar, Illinois is the State having the dominant interest. The defendant tavern owners and operators were licensed in Illinois where they conducted their respective businesses, including the sale of liquor to Schleicher. The plaintiff, the individual defendants and Schleicher, the intoxicated person, were all Illinois residents, and the corporate defendant had its place of busi-

ness there. Thus, the important contacts of the transaction were in Illinois, and there is no good reason for not applying Illinois law to the occurrence.

Illinois has such an interest in the welfare and protection of its citizens, and those dependent upon them, and has such an interest in regulating the evils attendant with the liquor traffic and the redress of injury or loss of support arising therefrom, that its courts should, under the circumstance of this case, give extraterritorial effect to the Illinois Dram Shop Act. Such action would give protection to justified expectations, enforce the fundamental policy underlying the Dram Shop Act, and would render justice in the case.

Wisconsin's only contact with the present case—as the situs of the accident—is wholly fortuitous. The application of the Illinois Act with reference to its residents would not offend the comity of interstate relationships between the states of Illinois and Wisconsin.

█ In the light of these circumstances, the strict rule of lex loci delicti as announced in sections 377 and 378 of the Restatement of Conflict of Laws, in Colligan v. Cousar, supra, and in Butler v. Wittland, supra, would yield harsh, unjust and unnecessary results. Future determinations of the choice of law rule to be applied in kindred cases will be governed by the choice-influencing considerations suggested herein and by other similar and pertinent factors, which permit analysis of the policies and interests underlying the particular issue before the court.

In Griffith v. United Air Lines, Inc., supra, at pages 805 and 806, the court, in embracing a new choice of law rule in tort actions, pertinently stated:

"It must be emphasized that this approach to choice of law will not be chaotic and anti-rational. 'The alternative to a hard and fast system of doctrinal formulae is not anarchy. The difference is not be-

tween a system and no system, but between two systems; between a system which purports to have, but lacks, complete logical symmetry and one which affords latitude for the interplay and clash of conflicting policy factors.' Harper, 'Policy Basis of the Conflict of Laws: Reflections on Rereading Professor Lorenzen's Essays,' 56 Yale LJ 1155, 1157–1158 (1947). Moreover, in evaluating qualitatively the policies underlying the significant relationships to the controversy, our standard will be no less clear than the concepts of 'reasonableness' or 'due process' which courts have evolved over many years. See Cheatham in 'Comments on Babcock v. Jackson,' 63 Columbia L Rev 1212, 1229, 1230–1231 (1963).

"We are at the beginning of the development of a workable, fair and flexible approach to choice of law which will become more certain as it is tested and further refined when applied to specific cases before our courts."

We adopt this concept of the effect of abandoning the mechanical rule of thumb application of the lex loci delicti rule.

Our fast changing and moving era with its attendant new social and economic problems, requires a reevaluation of the choice of law rule in multistate tort situations, to the end that such rule will be made for the people and the problems of today. The nice tidy perfection of uniformity and simplicity should not prevail over elementary choice-influencing considerations, public policy, decency and justice.

 The plaintiff also contends that Count II of her complaint states a cause of action under the common law of Illinois. We find no merit in such contention. The Dram Shop Act created liability in Illinois where none existed at common law. Howlett v. Doglio, supra.

155

In Cunningham v. Brown, 22 Ill2d 23, 30, 31, 174 NE 2d 153 (1961), the court held that Section 14 of Article VI of the Liquor Control Act provides the only remedy against tavern owners and operators for injuries to the person, property or means of support by an intoxicated person or in consequence of intoxication. In Rubitsky v. Russo's Derby, Inc., supra, at pages 485 and 486, we held that under Wisconsin law there is no common-law liability for the sale or gift of liquor to an able-bodied man. Consequently, there is no basis in either Illinois or Wisconsin law for a cause of action under Count II.

The order of the trial court dismissing Count I of the complaint is reversed, and the order dismissing Count II thereof is affirmed. The cause is remanded to the trial court with reference to Count I for further proceedings consistent with the views expressed herein.

Affirmed in part, reversed in part, and remanded.

SEIDENFELD, J., concurs.

MORAN, J., dissents.

MORAN, J., dissenting:
While the majority opinion has been ably prepared by my colleagues, I feel compelled to dissent from the conclusions reached by them relative to the reversal of the trial court's order dismissing count I of the complaint. My reasons for doing so are as follows:

The Dram Shop Act, while it is remedial in purpose, still is penal in character and therefore should be strictly construed so as not to enlarge its language by interpretation. Rittmeyer v. Anderson, 49 Ill App2d 71, 75, 199 NE2d 463 (1964); Miller v. Owens-Illinois Glass Co., 48 Ill App2d 412, 420, 199 NE2d 300 (1964), appeal denied, 30 Ill2d 627. The opinion today not only liberally

construes the Act but enlarges its language through interpretation.

I question the premise that the wrong contemplated by the Act is singular and limited to the giving or selling of liquor to any person, which giving or selling causes the intoxication of such person. It is my opinion that the wrong contemplated by the Act is twofold, one being the intoxication of a person and the other being an injury caused by that person as a result of the intoxication. Either one standing alone would not be actionable. It is necessary that a combination of the two would have to take place in order to reap the benefits of the right created by the Act. Therefore, contrary to the majority opinion, the place of the injury becomes relevant and, consequently, is a proper subject for legislative determination.

The right as created by the legislature was unknown to the common law. If the Act need be enlarged to include extraterritorial effect, then it should be the legislature and not the courts that should extend or modify its present limitations. See, Maki v. Frelk (Ill2d), 239 NE2d 445 (1968). This is especially true in light of the fact that our court has continually and consistently held that the Dram Shop Act is without extraterritorial effect. See, Rubitsky v. Russo's Derby, Inc., 70 Ill App2d 482, 216 NE2d 680 (1966); Liff v. Haezbroeck, 51 Ill App2d 70, 200 NE2d 525 (1964); Colligan v. Cousar, 38 Ill App2d 392, 187 NE2d 292 (1963); Butler v. Wittland, 18 Ill App2d 578, 153 NE2d 106 (1958); Eldridge v. Don Beachcomber, Inc., 342 Ill App 151, 95 NE2d 512 (1950). It should be further noted that the Rubitsky case was not brought under the Dram Shop Act; in the Butler case both plaintiffs were citizens of Illinois, as was the plaintiff in the case at bar, and, in both the Eldridge and Colligan cases, the Supreme Court denied leave to appeal.

157

A further consideration is that, since the rule was first annunciated in the Eldridge case in 1950, there have been five amendments, by the legislature, of the section involved, none of which fostered extraterritorial effect.

For these reasons I am of the opinion that the trial court was correct in dismissing count I of the complaint. I concur with the majority opinion as to count II of the complaint and, therefore, I would affirm the order of the trial court in all respects as to the complaint filed by the plaintiff herein.