Shane T. DRINKWATER, Plaintiff-Respondent,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Jason R. Honshel and Additional Fictional Party #1 and Additional Fictional Party #2, Defendants,

MEDICAL ASSOCIATES HEALTH PLANS, Subrogated Defendant-Appellant.

Supreme Court

*No. 2004AP1793. Oral argument March 14, 2006.
—Decided June 1, 2006.*

2006 WI 56

(Also reported in 714 N.W.2d 568.)

For the subrogated defendant-appellant, there were briefs (in the court of appeals) by *Stephen C. Krumpe* and *O'Connor & Thomas, P.C.,* Dubuque, IA, and oral argument by *Stephen C. Krumpe.*

For the plaintiff-respondent, there was a brief (in the court of appeals) by *Mark H. Hoskins, Jr.,* and

*Hoskins, Kalnins, McNamara & Vogelsberg,* Lancaster, and oral argument by *Mark H. Hoskins, Jr.*

An amicus curiae brief was filed (in the court of appeals) by *William C. Gleisner, III* and *Law Offices of William C. Gleisner, III,* Milwaukee; *Rhonda L. Lanford* and *Habush Habush & Rottier, S.C.,* Madison, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on certification by the court of appeals pursuant to Wis. Stat. § 809.61 (2003–04). Medical Associates Health Plan, Inc. ("the Plan"), an Iowa corporation, appeals a circuit court judgment that applied Wisconsin law and determined that Shane Drinkwater must be made whole before the Plan was entitled to subrogation against his recovery for personal injuries. Drinkwater, a Wisconsin resident, was injured in a motor vehicle accident in Wisconsin, and the Plan paid medical expenses on his behalf through his employer's health insurance plan.

¶ 2. The issue is whether Iowa law or Wisconsin law applies to the Plan's subrogation claim against Drinkwater. Applying choice-of-law principles, we determine that Wisconsin law applies. Accordingly, Drinkwater must be made whole under Wisconsin law before the Plan may recover for any of Drinkwater's medical expenses. We conclude that the Plan is not entitled to subrogation against Drinkwater's recovery because he was not made whole under Wisconsin law. Therefore, we affirm the circuit court judgment.

I

¶ 3. The background facts relevant to this appeal are undisputed. Drinkwater is a Wisconsin resident who works at a company located in Iowa. He sustained

injuries that included a severe leg fracture when another motor vehicle struck his motorcycle in September 2002 in Wisconsin. The driver of the other vehicle was also a Wisconsin resident who was covered under an insurance policy issued by a Wisconsin insurance company. Both vehicles were registered in Wisconsin.

¶ 4. The Plan paid health care expenses on Drinkwater's behalf pursuant to a group health insurance contract it issued to Drinkwater's employer.[1] The Plan is an Iowa non-profit corporation and its principal offices and place of business are located in Iowa, although it has clinics in Iowa, Illinois, and Wisconsin. The contract was issued to Drinkwater's employer in Iowa.

¶ 5. Drinkwater commenced an action for personal injuries, naming the other driver and the driver's insurer as defendants, and naming the Plan as a potentially subrogated party. The Plan counterclaimed and cross-claimed, alleging a subrogated interest in the damages Drinkwater sought.

¶ 6. More specifically, the Plan alleged that pursuant to Iowa law, it was entitled to "first dollar" reimbursement and payment in full for all of its subrogated expenses without deduction or offset. It alleged that its subrogation interest was not subject to the Wisconsin "made-whole" doctrine of *Rimes v. State Farm Mutual Automobile Insurance Co.*, 106 Wis. 2d 263, 316 N.W.2d 348 (1982), but rather that it was entitled to full reimbursement from any of Drinkwater's recovery based upon the terms of the Plan contract and Iowa law.

---

[1] There are actually two plan contracts for two different years involved in this case, but the terms of the contracts as relevant here are the same. We refer to the contracts in the singular throughout this opinion.

¶ 7. The Plan contract contained a clause providing that the contract "shall be governed by and interpreted in accordance with the laws of the State of Iowa." It also contained a subrogation clause, which provided as follows:

> If a Member suffers an injury or condition, for which benefits are provided by [the Plan], through acts or omissions of a third party for which said third party (or any person or organization liable for such third party's conduct) is or may be legally liable, or if the Member recovers benefits from any person or organization by reason of such injury or condition, [the Plan] shall be subrogated, to the extent of the reasonable cash value of benefits, supplies, and services provided by [the Plan], to all the Member's rights of recovery against any person or organization . . . .

¶ 8. The other driver's negligence was conceded, as was the lack of any contributory negligence on Drinkwater's part. The insurer for the other driver paid its policy limit of $250,000.

¶ 9. Drinkwater and the Plan agreed to escrow $89,006.10 of the proceeds, the amount that the Plan had paid for his health care expenses. The Plan moved for a determination of its subrogation rights, requesting that the circuit court decide whether it was entitled to "overturn" Wisconsin's made-whole doctrine and whether Drinkwater was made whole.

¶ 10. The circuit court determined that Wisconsin law applied. It conducted a *Rimes* "made-whole" hearing in order to calculate Drinkwater's damages. The court found that his total damages were $424,000 as follows:

| | |
|---|---|
| Medical expenses: | $132,000 |
| Past loss of earnings: | $7,000 |

| Future loss of earning capacity: | $10,000 |
| Past pain, suffering, and disability: | $125,000 |
| Future pain, suffering, and disability: | $150,000 |

¶ 11. Accordingly, the circuit court concluded that Drinkwater would not be made whole by receipt of the $250,000 in proceeds from the tortfeasor's insurance. Applying Wisconsin's made-whole doctrine, it determined that Drinkwater was entitled to the escrowed funds. The court entered judgment in favor of Drinkwater, and the Plan appealed.

## II

¶ 12. The parties agree that under Wisconsin subrogation law, including *Rimes,* the Plan would not be entitled to subrogation against Drinkwater. The circuit court calculated his damages to be $424,000, which included $132,000 in medical expense, but he received only $250,000 from the tortfeasor. As the circuit court determined, Drinkwater was therefore not made whole. He would be further short-changed for every dollar that the Plan was able to recover. The Plan admits that if Wisconsin's made-whole doctrine applies, then Drinkwater prevails.

¶ 13. Conversely, Iowa has rejected Wisconsin's made-whole doctrine. *Ludwig v. Farm Bureau Mutual Insurance Co.,* 393 N.W.2d 143, 146 (Iowa 1986) ("We disagree with the holding of the *Rimes* case."). The parties agree that under Iowa law the Plan would be entitled to invade Drinkwater's recovery of $250,000 to obtain reimbursement of medical expenses it paid on his behalf. Consequently, the question of whether Wis-

consin law or Iowa law applies will determine the outcome of this case.

¶ 14. In order to resolve this question, we must employ a choice-of-law analysis in order to determine whether Iowa law or Wisconsin law applies. This choice-of-law determination is a question of law subject to independent appellate review. *American Family Mut. Ins. Co. v. Powell,* 169 Wis. 2d 605, 609, 486 N.W.2d 537 (Ct. App. 1992).

A

¶ 15. We begin with a review of the development and status of the made-whole doctrine in Wisconsin. The made-whole doctrine in Wisconsin has deep and firm roots. It traces back at least 75 years to *Hamill v. Kuchler,* 203 Wis. 414, 232 N.W. 877 (1931), and is based largely on the equitable nature of subrogation.

¶ 16. In *Hamill,* a property case involving mortgage and lien rights, the court explained that "subrogation does not arise until the debt has been fully paid." *Hamill,* 203 Wis. at 425. "Until that is done the right of subrogation is a mere inchoate right and cannot be enforced." *Id.* (quoting *Defiance Mach. Works v. Gill,* 170 Wis. 477, 483, 175 N.W. 940 (1920)). Subrogation "is a creation of the law whereby the substantial ends of justice may be accomplished regardless of contract relations." *Id.* (quoting *Poluckie v. Wegenke,* 137 Wis. 433, 437, 119 N.W. 188 (1909)).

¶ 17. These concepts from *Hamill* were reinforced and applied in the insurance context in *Garrity v. Rural Mutual Insurance Co.,* 77 Wis. 2d 537, 541–46, 253 N.W.2d 512 (1977). In *Garrity* the court concluded

that a subrogation clause in a standard fire insurance policy "did not change the substantive common law rights of the insured." *Garrity,* 77 Wis. 2d at 541. The court cited "the general rule that there is no subrogation until the insured is made whole." *Id.* at 542. "[T]he insurer has no right as against the insured where the compensation received by the insured is less than his loss." *Id.* at 543 (quoting *Couch on Insurance,* § 61.61 (2d ed. 1968)).

¶ 18. Subsequently, in *Rimes,* this court again reinforced the centrality of the equitable nature of subrogation, concluding that "only where an injured party has received an award . . . which pays all of his elements of damages . . . is there any occasion for subrogation." *Rimes,* 106 Wis. 2d at 275. This time, the court was addressing whether an automobile insurer that made payments to an insured under the medical-pay provisions of its policy could enforce a subrogation agreement when the insured received in settlement less than the total damages incurred. *Id.* at 264.

¶ 19. The court in *Rimes* looked to *Garrity* as its guide, explaining that "one who claims subrogation rights, whether under the aegis of either legal or conventional [contractual] subrogation, is barred from any recovery unless the insured is made whole." *Id.* at 272. It said that the purpose of subrogation is to prevent a double recovery. *Id.* Thus, only when an insured has received full damages from the tortfeasor and has been paid for a portion of those damages by the insurer is the insurer, under principles of equity, entitled to subrogation. *Id.* When either the insurer or insured must to some extent go unpaid, the loss should be borne by the insurer because that is a risk that the insured has paid the insurer to assume. *Id.* at 275–76 (citing *Garrity,* 77 Wis. 2d at 542.)

650

¶ 20. This court again reaffirmed Wisconsin's commitment to the made-whole doctrine in *Ruckel v. Gassner,* 2002 WI 67, 253 Wis. 2d 280, 646 N.W.2d 11. In a unanimous decision, it held that under *Rimes* and *Garrity,* an insured must be made whole before an insurer may exercise subrogation rights against its insured, even when unambiguous language in an insurance contract states otherwise. *Ruckel,* 253 Wis. 2d 280, ¶¶ 4, 40, 43.

¶ 21. *Ruckel,* much like the case at bar, involved medical expenses paid under a group benefit plan. *Id.,* ¶¶ 6–7. The insurance contract included a subrogation clause entitling the insurer to full repayment of the expenses. *Id.,* ¶ 9. It stated that the insurer's right to repayment was "prior and superior" to the right of any other person, including the beneficiary. *Id.*

¶ 22. The court explained that the insurer's argument, that the subrogation clause in its policy was clear, "misse[d] the point." *Id.,* ¶ 41. Rather, the court explained: "The clause is not unclear; it is inequitable. It is contrary to the most fundamental precepts of subrogation." *Id.* Subrogation under circumstances where the insured had not been made whole "turn[s] the entire doctrine of subrogation on its head." *Id.*

¶ 23. Thus, our case law culminating with *Ruckel* establishes that in Wisconsin the made-whole doctrine can trump express language in an insurance contract: "[P]ursuant to this court's holdings in *Garrity* and *Rimes,* an insurer is not entitled to subrogation against its insured unless and until the insured is made whole, regardless of contractual language to the contrary." *Id.,* ¶ 43.

B

■

¶ 24. The Plan asserts that this is a contract case and that its Iowa choice-of-law clause is controlling. Furthermore, the Plan argues that even if the clause is not controlling, Iowa is the state with the most significant relationship to the question at hand. Thus, the Plan contends, Iowa law should control under a choice-of-law analysis. We disagree.

¶ 25. This court recognized in *Bush v. National School Studios, Inc.,* 139 Wis. 2d 635, 407 N.W.2d 883 (1987), that there is a qualification on the freedom to contract for choice of law. The qualification "has been recognized by commentators and frequently invoked by courts." *Id.* at 642. Although parties may seek to promote "certainty and predictability in contractual relations," they will not be "permitted to do so at the expense of important public policies of a state whose law would be applicable if the parties choice of law provision were disregarded." *Id.; see also Beilfuss v. Huffy Corp.,* 2004 WI App 118, ¶¶ 13, 16, 20, 274 Wis. 2d 500, 685 N.W.2d 373; *General Med. Corp. v. Kobs,* 179 Wis. 2d 422, 428, 507 N.W.2d 381 (Ct. App. 1993) ("parties cannot, by contract, override fundamental polices of the state whose law would be applicable absent the choice of law provision").

¶ 26. "A precise delineation of those policies which are sufficiently important to warrant overriding a contractual choice of law stipulation is not possible." *Bush,* 139 Wis. 2d at 643. However, "statutes or common law which make a particular . . . contract provision unenforceable . . . or that are designed to protect a weaker party against the unfair exercise of superior bargaining

power by another party, are likely to embody an important state public policy." *Id.*

¶ 27. In *Bush,* for example, a school portrait photographer initiated an action against the corporation for which he worked, asserting that he was terminated without cause in violation of the Wisconsin Fair Dealership law. *Id.* at 637–38. This court concluded that it would not honor the parties' choice-of-law clause specifying Minnesota law in light of the strong public policy represented by Wisconsin's fair dealership laws. *Id.* at 639, 644–45.

¶ 28. Another example of this qualification on the freedom to contract for choice-of-law is *Beilfuss.* There, a sales manager sought to have covenants not to compete with his former employer declared unenforceable. *Beilfuss,* 274 Wis. 2d 500, ¶¶ 2–3. The court of appeals determined that the covenants were not enforceable under Wisconsin's long-standing public policy controlling covenants not to compete, despite a choice-of-law provision in the contract specifying that Ohio law applied. *Id.,* ¶¶ 3, 7, 20.

¶ 29. A *Bush*-type qualification on the freedom to contract for choice of law is apt here. First, this court's jurisprudence culminating in *Ruckel* establishes that in Wisconsin the made-whole doctrine trumps an express contract provision to the contrary. Second, the contractual bargaining in this case occurred between the Plan and Drinkwater's employer, not between the Plan and Drinkwater. He had no choice or opportunity to bargain as to the terms of the Plan contract. If a party who actually bargained for a choice-of-law clause may seek to set it aside based on an overriding state public policy, as in *Bush* and *Beilfuss,* certainly a party who had no

choice or opportunity to bargain for such a clause may do likewise, at least when it dictates his or her right to recover damages.

¶ 30. Moreover, the issue before us is not simply one of contract, as the Plan asserts. To treat it as such, without recognizing the tort aspects that this issue implicates, is to ignore the true nature of the question before the court. To rest the analysis of this case only on contract contravenes this court's analysis in *Ruckel,* which applied equity, not contract, to a tort recovery. In *Ruckel* we held that an insurer is not entitled to subrogation until the insured is made whole "regardless of contractual language to the contrary." *Ruckel,* 253 Wis. 2d 280, ¶ 43.

¶ 31. For all of these reasons, we determine that the express choice-of-law provision for Iowa law in the Plan contract does not necessarily control the Plan's subrogation right against Drinkwater's recovery for personal injuries. Rather, we must apply a choice-of-law analysis to determine if, absent the clause, Wisconsin law would apply. *See Bush,* 139 Wis. 2d at 642; *Kobs,* 179 Wis. 2d at 428.

## C

¶ 32. Wisconsin's choice-of-law jurisprudence, at least up until recently, has had something of a checkered past. It would likely be impossible to fully reconcile the 30 years of Wisconsin jurisprudence immediately following this court's decision in *Wilcox v. Wilcox,* 26 Wis. 2d 617, 133 N.W.2d 408 (1965). In *Wilcox,* the court joined the "choice of law revolution" of the 1960s by rejecting traditional choice-of-law analysis that inflexibly looked to the law of the place of a wrong, *"lex loci delicti." See* Shirley A. Wiegand, *Officious Intermed-*

*dling, Interloping Chauvinism, Restatement (Second), and Leflar: Wisconsin's Choice of Law Melting Pot,* 81 Marq. L. Rev. 762, 772 (1998); *see also Wilcox,* 26 Wis. 2d at 620–21.

¶ 33. Professor Wiegand, in the article cited, maintained that "choice-of-law decisions in this state have traveled a very bumpy road" beginning with *Wilcox.* Wiegand, 81 Marq. L. Rev. at 796. She explained that although this court had "hoped for a 'practical and workable' approach which would serve as 'a guide to the future to provide a uniform common law of conflicts,' lower court decisions demonstrate that vision has not yet been achieved." *Id.* at 803 (quoting *Wilcox,* 26 Wis. 2d at 621, 635) (footnotes omitted).

¶ 34. We need not attempt to reconcile all of the cases to which Professor Wiegand referred in 1998. The question now before us, which involves the made-whole doctrine, is not clearly controlled by any of our previous choice-of-law cases. We apply instead our more recent choice-of-law jurisprudence to determine whether Iowa law or Wisconsin law applies.

¶ 35. Since the time that Professor Wiegand wrote, this court decided *State Farm Mutual Automobile Insurance Co. v. Gillette,* 2004 WI 31, 251 Wis. 2d 561, 641 N.W.2d 662, and *Beloit Liquidating Trust v. Grade,* 2004 WI 39, 270 Wis. 2d 356, 677 N.W.2d 298. Both cases, *Gillette* in particular, supply the choice-of-law framework for our analysis here.

¶ 36. *Gillette* establishes—perhaps contrary to some of the cases criticized in the Wiegand article—that insurance-related issues which arise as part of a personal injury lawsuit are not always readily categorized as sounding in tort or contract. In *Gillette,* this court

explained that when an insured sues an insurance company for underinsured motorist coverage, "contract law and tort law converge." *Gillette,* 251 Wis. 2d 561, ¶ 31. "Contract law applies to interpret the insurance policy, but an insured's right to underinsured motorist benefits hinges on the existence of a tort cause of action against the underinsured motorist." *Id.*

¶ 37. Similarly here, where the Plan seeks subrogation against Drinkwater's recovery from the tortfeasor, contract law and tort law converge. Although contract law applies to the interpretation of the Plan's insurance contract with Drinkwater's employer, his right to recover hinges on the existence of his tort cause of action against the tortfeasor.

¶ 38. The issue before us cannot be characterized purely as one of contract. At oral argument, the Plan's counsel asserted that its claim was only a contract claim and that "but for" the Plan contract, it would have no claim. It can just as easily be said, however, that the Plan would have no claim but for the tort that set this case in motion. The Plan concedes, as it must, that "the contract involves the proceeds of a tort action." Indeed, the Plan's counterclaim and cross-claim as a potentially subrogated party incorporate all of Drinkwater's allegations "that are essential to state a negligence cause of action for personal injuries."[2]

---

[2] The Plan is incorrect in asserting that "*Schlosser* [*v. Allis-Chalmers Corp.,* 86 Wis. 2d 226, 271 N.W.2d 879 (1978)]'s rationale, if not holding, is directly on point." That case, which involved a group life insurance plan, might be distinguished in a number of ways. For our purposes here, it is sufficient to note that the controversy in *Schlosser* sounded only in contract, and the court applied a different choice-of-law framework from that in *State Farm Mutual Automobile Insurance Co. v. Gillette,* 2002 WI 31, 251 Wis. 2d 561, 641 N.W.2d 662.

¶ 39. Regardless of how the issue in this case is characterized, Drinkwater's right to recover is diminished on a dollar-for-dollar basis to the extent that the Plan is entitled to subrogation. Drinkwater's right to recover in tort is thus tightly bound to the Plan's subrogation right, just as the *Gillette* plaintiff's right to recover was tightly bound to his insurance company's asserted rights under the insurance contract in that case. We therefore follow *Gillette,* applying its choice-of-law framework to determine whether Wisconsin law or Iowa law applies. The framework in *Beloit Liquidating* is similar. Thus, we look also to its principles to guide us.[3]

---

[3] We caution that neither the law of the forum nor the law of the place of accident is the choice-of-law rule applicable to every fact situation or issue that might arise regarding a group benefit plan or a contractual subrogation clause. *See Gillette,* 251 Wis. 2d 561, ¶ 87. "A law of one jurisdiction could be invoked with respect to some issues and in some fact situations and the law of another jurisdiction invoked in respect to other issues and other fact situations." *Id.*

Thus, the dissent paints our opinion with too broad a brush when it declares that "[t]he rule of this case is that Wisconsin law will trump Illinois or Iowa subrogation law on a Wisconsin injury to a Wisconsin resident when the case is tried in a Wisconsin court." Dissent, ¶ 76.

In addition, we note that both parties agree that this case does not involve a self-funded insurance plan that is subject to the federal Employment Retirement Income Security Act (ERISA). Thus, we are not presented with questions such as federal preemption of state subrogation law under ERISA in this case. For further discussion of ERISA questions, see Arnold P. Anderson, 2 *Wisconsin Insurance Law* §§ 10.124–10.126 (5th ed. 2004); *see also Ruckel v. Gassner,* 2002 WI 67, ¶ 42 n.7, 253 Wis. 2d 280, 646 N.W.2d 11 (explaining that legislatively-sanctioned subrogation, including ERISA, may override common law made-whole principles).

¶ 40. The "first rule" in the choice-of-law analysis under *Gillette* is "that the law of the forum should presumptively apply unless it becomes clear that non-forum contacts are of the greater significance." *Gillette,* 251 Wis. 2d 561, ¶ 51 (internal quotations omitted). Under *Gillette,* if it is not clear that the nonforum contacts are of greater significance, then the court applies five choice-influencing factors:

(1) Predictability of results;

(2) Maintenance of interstate and international order;

(3) Simplification of the judicial task;

(4) Advancement of the forum's governmental interests; and

(5) Application of the better rule of law.

*Gillette,* 251 Wis. 2d 561, ¶ 53; *see also Heath v. Zellmer,* 35 Wis. 2d 578, 595–96, 151 N.W.2d 664 (1967).[4]

¶ 41. The court in *Beloit Liquidating* referred to two tests to apply in a choice-of-law analysis. The first test is "whether the contacts of one state to the facts of the case are so obviously limited and minimal that application of that state's law constitutes officious intermeddling." *Beloit Liquidating,* 270 Wis. 2d 356, ¶ 24 (quoting *American Standard Ins. Co. v. Cleveland,* 124 Wis. 2d 258, 263, 369 N.W.2d 168 (Ct. App. 1985)). The

---

[4] The factors were suggested by Robert A. Leflar in his article, *Choice-Influencing Considerations in Conflicts Law,* 31 N.Y.U. L. Rev. 267 (1966). *See Beloit Liquidating Trust v. Grade,* 2004 WI 39, ¶ 25 n.15, 270 Wis. 2d 356, 677 N.W.2d 298. This court first applied the factors in *Heath v. Zellmer,* 35 Wis. 2d 578, 595–96, 151 N.W.2d 664 (1967).

second test involves an examination of the five choice-influencing factors. *Beloit Liquidating,* 270 Wis. 2d 356, ¶ 25.[5]

¶ 42. The "first rule" of *Gillette* and the first test of *Beloit Liquidating* are related. It could not "become[] clear that nonforum contacts are of the greater significance" (*Gillette*) if the nonforum state's contacts are "so obviously limited and minimal that application of that state's law constitutes officious intermeddling" (*Beloit Liquidating*).

¶ 43. That said, we need not address further the relationship of the "first rule" of *Gillette* and the first test of *Beloit Liquidating*. The application of either *Gillette*'s "first rule" or *Beloit Liquidating*'s first test to the facts here necessitates that we apply the five choice-influencing factors. It is not "clear" whether Iowa's contacts are of the "greater significance" (*Gillette*), yet Iowa's contacts are not "so obviously limited and minimal" that application of Iowa law would constitute officious intermeddling (*Beloit Liquidating*).

¶ 44. Specifically, the relevant contacts of Iowa and Wisconsin include the following:

---

[5] In *Beloit Liquidating,* the court applied the five factors even after determining that the application of the nonforum state's law would have constituted officious intermeddling. *Beloit Liquidating,* 270 Wis. 2d 356, ¶¶ 24–32, 677 N.W.2d 298; *see also Finch v. Southside Lincoln-Mercury, Inc.,* 2004 WI App 110, ¶¶ 28–31, 274 Wis. 2d 719, 685 N.W.2d 154; *but see American Standard Ins. Co. v. Cleveland,* 124 Wis. 2d 258, 263, 369 N.W.2d 168 (Ct. App. 1985) ("[I]f no officious intermeddling would result, then we apply the choice-influencing considerations . . . .").

- The accident and Drinkwater's injuries occurred in Wisconsin.

- Drinkwater is a Wisconsin resident who works at an Iowa company.

- The Plan is an Iowa corporation with its principal offices and place of business located in Iowa, although it has clinics in Iowa, Illinois, and Wisconsin.

- The Plan contract was issued in Iowa to Drinkwater's employer.

- The tortfeasor is a resident of Wisconsin and was covered under an insurance policy issued by a Wisconsin insurance company.

- Both Drinkwater and the other driver were operating vehicles registered in Wisconsin at the time of the accident.

¶ 45. Both Wisconsin's and Iowa's contacts are significant. It is not clear that Iowa's contacts are of greater significance (*Gillette*). At the same time, however, Iowa's contacts are more than minimal and limited (*Beloit Liquidating*). We therefore turn to apply the five choice-influencing factors.

■

¶ 46. **Predictability of results.** This factor deals with the parties' expectations; put another way, what legal consequences comport with the predictions or expectations of the parties? *Gillette,* 251 Wis. 2d 561, ¶ 54. Whether the application of Iowa law or Wisconsin law is more likely to lead to predictable and expected results under the facts of this case depends on which party's perspective on predictability and expectations is considered.

¶ 47. On the one hand, the application of Iowa law is consistent with the Plan's ability to predict and expect that Iowa law will apply to all its insureds or

members. On the other hand, Wisconsin citizens are entitled to some assurance that when they suffer injuries within their own state, they can generally predict and expect that Wisconsin law will dictate their rights to recovery.

¶ 48. It may be true that the Plan reaps some benefit from the ability to know with complete predictability that Iowa law will apply. Yet, the application of Wisconsin law in this case does not completely undermine predictability for the Plan. A company such as the Plan is in a relatively good position to calculate the risks associated with decreased predictability whether Iowa law will apply. In contrast, we would not expect reasonable Wisconsin insureds to foresee that they should routinely over-insure themselves for injuries resulting from Wisconsin accidents on the off chance they might become subject to another state's law that effectively limits their recovery.

¶ 49. Thus, although the application of Iowa law might modestly increase predictability for the Plan, the application of Wisconsin law would facilitate predictability for Wisconsin citizens such as Drinkwater. The Plan, and those similarly situated, are in a better position to calculate the risk of a modest amount of unpredictability and adjust accordingly. The first factor therefore points at least somewhat to the application of Wisconsin law.

¶ 50. **Maintenance of interstate order.** This factor requires that a jurisdiction which is minimally concerned defer to a jurisdiction that is substantially concerned. *Gillette,* 251 Wis. 2d 561, ¶ 55. Under the facts of this case both jurisdictions are more than minimally concerned.

661

¶ 51. We cannot say that the application of Wisconsin law would appreciably impede state-to-state commercial intercourse as compared to the application of Iowa law. Although it might be said that the application of Wisconsin law would discourage Iowa companies from hiring Wisconsin residents, it might just as easily be said that the application of Iowa law would discourage Wisconsin citizens from working for Iowa corporations. Thus, somewhat paradoxically, both Iowa and Wisconsin have at least some interest in the application of either jurisdiction's laws.

¶ 52. In addition, we note that this case does not appear to involve the risk of forum shopping. The accident occurred in Wisconsin, and both Drinkwater and the tortfeasor who caused his injuries are Wisconsin residents. Similarly, any fear that a prospective plaintiff would move to this state merely to take advantage of its made-whole doctrine is unfounded. All in all, the second factor does not appreciably favor Iowa law or Wisconsin law.

¶ 53. **Simplification of the judicial task.** This court has stated a general rule that the judicial task is rarely simplified when lawyers and judges must apply themselves to foreign law. *Beloit Liquidating,* 270 Wis. 2d 356, ¶ 28; *see also Finch v. Southside Lincoln-Mercury, Inc.,* 2004 WI App 110, ¶ 30, 274 Wis. 2d 719, 685 N.W.2d 154 ("application of our own law, as opposed to the law of a foreign jurisdiction, will always simplify our judicial task, except where Wisconsin law is complex or uncertain as compared to that of the other jurisdiction").[6]

---

[6] *Cf. Gillette,* 251 Wis. 2d 561, ¶ 59 ("A Wisconsin court can easily and simply apply Manitoba law to determine damages in the present case."). Professor Leflar explained as follows: "It

¶ 54. The judicial task would not be simplified by the application of Iowa law. In order to see why, we will delve a bit deeper into Iowa law.

¶ 55. In *Ludwig,* the Iowa Supreme Court rejected the Wisconsin approach to the made-whole doctrine. *Ludwig,* 393 N.W.2d at 146. It concluded that amounts recovered against a third party for separate elements of a claim can be identified and credited toward subrogation claims, even though other elements of the claim against the third party may not be fully satisfied. *Id.* The court explained that its holding could be implemented if parties included allocation of elements of damages in settlement documents or special interrogatories. *Id.*

¶ 56. The Iowa Supreme Court acknowledged that in many cases identification of specific amounts could become difficult because a lump sum settlement might be made. *Id.* at 146 n.2. Similarly, the court recognized, the insured and third party might be "less than solicitous" of the interests of a subrogee, and might therefore attempt to establish by agreement that the settlement included little to no reimbursement for the element of damages in which the subrogee is interested. *Id.* Thus, the court reasoned, a mini-trial such as that in *Rimes* might be required. *Id.; see also Iowa American Ins. Co. v. Pipho,* 456 N.W.2d 228, 230 (Iowa Ct. App. 1990) (remanding for a "mini-trial" because a settlement did not state what share of the plaintiff's medical bills was attributed to a settlement agreement).

has been argued that a court should apply its own local law unless there is good reason for not doing so. No one can deny the propriety of this argument so long as the 'unless' clause is adequately emphasized." Leflar, 31 N.Y.U. L. Rev. at 288 (footnote omitted).

¶ 57. Accordingly, it cannot be said that the application of Iowa law would simplify the judicial task. Iowa case law suggests that a *Rimes*-type hearing may often be required under Iowa law. Thus, the application of Iowa law would be no simpler than the application of Wisconsin law. Moreover, the *Ludwig* court's discussion causes us concern that the application of Iowa law might inject additional opportunities for litigants to game the system, thereby increasing the potential complexity of the judicial task. This factor points to the application of Wisconsin law.

¶ 58. **Advancement of the forum's governmental interests.** "The question in private litigation, such as in an automobile-accident case, is whether the proposed nonforum rule comports with the standards of fairness and justice that are embodied in the policies of the forum law." *Gillette,* 251 Wis. 2d 561, ¶ 62 (quoting *Heath,* 35 Wis. 2d at 598 (1967)). "If it appears that the application of forum law will advance the governmental interest of the forum state, this fact becomes a major, though not in itself a determining, factor in the ultimate choice of law." *Gillette,* 251 Wis. 2d 561, ¶ 62; *accord Beloit Liquidating,* 270 Wis. 2d 356, ¶ 30.

¶ 59. Wisconsin has a strong interest in compensating its residents who are victims of torts. *Gillette,* 251 Wis. 2d 561, ¶ 61; *Conklin v. Horner,* 38 Wis. 2d 468, 481, 157 N.W.2d 579 (1968) ("The policy of our tort law is to compensate those who are injured by negligent acts.").[7]

¶ 60. Our state's made-whole doctrine, with its deep and firm roots, is a central means by which

---

[7] This court has also recognized "admonitory" and deterrent aspects of our tort law. *Gillette,* 251 Wis. 2d 561, ¶ 64; *Conklin v. Horner,* 38 Wis. 2d 468, 482, 157 N.W.2d 579 (1968). Similarly, the court has said: "It is in the interest of this state and of its

Wisconsin's interest in compensating its resident tort victims is effectuated. The court has repeatedly reaffirmed the strength and reach of the doctrine. As already explained, this occurred most recently in *Ruckel* in which the court held that under *Rimes* and *Garrity* an insured must be made whole before an insurer may exercise subrogation rights against its insured, even when an unambiguous subrogation clause in an insurance contract states otherwise. *Ruckel*, 253 Wis. 2d 280, ¶¶ 4, 40, 43.

¶ 61. In order for this factor to weigh in favor of the application of Wisconsin law, we need not determine that Iowa's law is a "bad law" or that it "serves no legitimate purpose." *Gillette*, 251 Wis. 2d 561, ¶ 65. We can, and do, however, determine that limiting Drinkwater's net recovery to less than the damages he would recover under Wisconsin law undermines Wisconsin's significant interest in fully compensating its citizens who are tort victims. This factor points strongly to the application of Wisconsin law.

¶ 62. **Application of the better rule of law.** As previously suggested, we need not and do not necessarily conclude that Iowa law is bad law or serves no legitimate purpose. Yet, this court's repeated affirmations of Wisconsin's made-whole doctrine must to some extent be taken as an indication of Wisconsin's view that our made-whole doctrine constitutes the better rule. This court has rejected the Iowa approach.

¶ 63. We cannot help but observe that the application of Iowa law would seem to work inequitable results, at least from the viewpoint of a tort system such as that in Wisconsin. At oral argument, counsel for

citizens to retain where possible those laws which require motorists to refrain from acts of ordinary negligence." *Conklin,* 38 Wis. 2d at 483.

the Plan conceded that if Drinkwater's medical expenses had been $251,000, a sum that is $1,000 more than the limits of the tortfeasor's liability insurance, under Iowa law the Plan would have been subrogated to all of Drinkwater's recovery. In other words, according to the Plan's counsel, the most severe cases of injury are those in which the injured party would be most likely to end up with a net recovery of zero. This is the type of result that, as we declared in *Ruckel,* "turn[s] the entire doctrine of subrogation on its head." *Ruckel,* 253 Wis. 2d 280, ¶ 41. The final factor thus points to the application of Wisconsin law.

¶ 64. Considering the five choice-influencing factors together, we conclude that Wisconsin law should apply. All of the factors either point to the application of Wisconsin law or are neutral. The parties agree, as do we, that under Wisconsin's made-whole doctrine, the Plan is not entitled to any subrogation against Drinkwater's recovery. Accordingly, we need go no further to conclude that the circuit court judgment must be affirmed.

### III

¶ 65. In sum, we conclude that Wisconsin law applies to require that Drinkwater must be made whole before the Plan is entitled to subrogation against Drinkwater's recovery for his personal injuries. The Plan is not entitled to subrogation because Drinkwater was not made whole under Wisconsin law. Accordingly, we affirm the circuit court judgment.

*By the Court.*—The judgment of the Grant County Circuit Court is affirmed.

¶ 66. DAVID T. PROSSER, J. (*dissenting*). The made-whole doctrine is a well-established feature of

Wisconsin tort and insurance law. I support this doctrine and wish it were the law in all jurisdictions. Unfortunately, it is not. We must recognize that fact in considering this case.

¶ 67. Shane Drinkwater was very badly injured by an underinsured Wisconsin motorist. He has not been made whole. If Mr. Drinkwater were employed by a Wisconsin employer and insured by a Wisconsin insurer, there would be no dispute that the made-whole doctrine would apply to his case. But the facts are otherwise. At the time of the accident, Mr. Drinkwater worked for an Iowa employer and was insured by an Iowa health plan. In the insurance contract, the Iowa insurer explicitly reserved its subrogation rights, as permitted under Iowa law, and it unambiguously provided that Iowa law would govern the contract.

¶ 68. Mr. Drinkwater's employer, United Clinical Laboratories, is located in Dubuque. The company has more than 100 employees.

¶ 69. The Dubuque metropolitan area includes the states of Illinois, Iowa, and Wisconsin. Jo Daviess County in Illinois and Grant County in Wisconsin are directly across the Mississippi River from Dubuque. Because of this geography, there is a good possibility that Shane Drinkwater was not the only Wisconsin resident who worked for United Clinical Laboratories. There is a good possibility that Illinois residents work there as well.

¶ 70. All the employees of United Clinical Laboratories who live in Iowa and all the employees of United Clinical Laboratories who live in Illinois are governed by the subrogation clause in the Medical Associates Health Plan. The Illinois residents are gov-

erned by the clause because Illinois,[1] like Iowa,[2] does not recognize the made-whole doctrine.

¶ 71. United Clinical Laboratories is one of numerous employers in the border states of Illinois and Iowa who employ Wisconsin residents. Many of these employers afford their employees health care plans that contractually reserve subrogation rights and do not recognize the made-whole doctrine. Some of these employers may be much smaller than United Clinical Laboratories. Conversely, Shane Drinkwater is one of the thousands of Wisconsin residents who drive across this state's border to take advantage of an employment opportunity and health insurance in one of these neighboring states.[3]

¶ 72. These Wisconsin residents will receive enhanced protection because of this court's decision *if* they are involved in an accident in Wisconsin. They will receive more protection than their co-workers and consequently may become more expensive to insure than their co-workers who live in Illinois or Iowa. This may have an effect on health care costs for their employers. It may have an effect on Wisconsin resident employment.

¶ 73. In resolving the choice of law issue presented here, the court skillfully marshals the facts and

---

[1] *Eddy v. Sybert*, 783 N.E.2d 106, 110 (Ill. App. Ct. 2003).

[2] *Ludwig v. Farm Bureau Mut. Ins. Co.*, 393 Wis. 2d 143 (Iowa 1986).

[3] The Wisconsin Department of Revenue estimates that in 2004 more than 53,000 Wisconsin residents were employed at jobs in Illinois. *See* Letter dated December 28, 2005, from Michael L. Morgan, State of Wisconsin Secretary of Revenue, to Brian Hamer, Director, Illinois Department of Revenue (on file with the State of Wisconsin Department of Revenue, Madison, Wisconsin).

policy in a manner that supports its decision. But some of the facts carry no weight. For instance, the fact that "[t]he tortfeasor is a resident of Wisconsin and was covered under an insurance policy issued by a Wisconsin insurance company," majority op., ¶ 44, is really not relevant. The law would not be different if the tortfeasor lived in Illinois and was covered under a policy issued by an Illinois insurance company. What is important is that the tortfeasor's insurer provided liability coverage.

¶ 74. The fact that "[b]oth Drinkwater and the other driver were operating vehicles registered in Wisconsin at the time of the accident," *id.,* also is not significant. It merely supplements the fact that the two drivers were Wisconsin residents.

¶ 75. There are three important Wisconsin-related facts: (1) Mr. Drinkwater was and is a Wisconsin resident; (2) his accident occurred in Wisconsin; and (3) his suit was filed in Wisconsin.

¶ 76. The rule of this case is that Wisconsin law will trump Illinois or Iowa subrogation law on a Wisconsin injury to a Wisconsin resident when the case is tried in a Wisconsin court.

¶ 77. What is not clear is what the result would be if there were a Wisconsin injury to an Illinois or Iowa resident and the case were tried in a Wisconsin court against the insured's home state insurer (like Medical Associates Health Plan) claiming subrogation rights. Because Wisconsin is visited by hundreds of thousands of out-of-state tourists, this sort of scenario must be anticipated.

¶ 78. We also do not know what the result would be if a Wisconsin resident like Mr. Drinkwater were to be injured in an Illinois or Iowa accident but able to sue in Wisconsin and bring in the out-of-state insurer claiming subrogation.

¶ 79. This uncertainty undermines the predictability of results. As this court stated:

> Predictability is one of the choice-influencing considerations that deserves special emphasis in consensual arrangements. . . . [S]ince a legal relationship is entered into by pre-arrangement, it is imperative that the parties know their rights will be the same, irrespective of the forum, and that their agreement will have the same consequences, irrespective of where the contract is performed or where a dispute in regard to it is resolved.

*Heath v. Zellmer,* 35 Wis. 2d 578, 596, 151 N.W.2d 664 (1967).

¶ 80. The result in this case is certainly fair to Mr. Drinkwater. The nagging concern is whether our decision will have collateral consequences to other people or the law.